**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ANDREW E. ROTH, derivatively on behalf of YRC WORLDWIDE INC., <br><br>       Plaintiff, <br><br>   vs. <br><br> SOLUS ALTERNATIVE ASSET MANAGEMENT LP, SOLUS GP LLC, SOLA LTD, SOLUS OPPORTUNITIES FUND 1 LP, SOLUS OPPORTUNITIES FUND 2 LP, SOLUS CORE OPPORTUNITIES MASTER FUND LTD, ULTRA MASTER LTD, CHRISTOPHER PUCILLO, and YRC WORLDWIDE INC., <br><br>       Defendants. | Case No. 1:14-cv-09571-WHP <br><br> ECF Case |

**SOLUS' MEMORANDUM OF LAW IN SUPPORT OF ITS**
**MOTION TO DISMISS THE PLAINTIFF'S AMENDED COMPLAINT**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................1

BACKGROUND ........................................................................................................2

    A.    The Transactions At Issue.............................................................................2

        1.    Solus Invests In YRC Worldwide Inc.................................................2

        2.    YRC Negotiates Restructuring Agreements With Its Creditors ................4

        3.    Execution Of The Blocker Provision Immediately Reduces Solus' Beneficial Ownership Of YRC Stock To Below Ten Percent....................4

        4.    The Other Obligations Contained In The Restructuring Agreements Are Subject to Material Conditions Precedent .......................5

        5.    YRC's New Collective Bargaining Agreement Is Voted Down By Its Employees...........................................................................7

        6.    YRC Negotiates A Second Collective Bargaining Agreement With Its Employees........................................................................7

        7.    YRC's Restructuring Agreements Close on January 31, 2014...................8

    B.    Plaintiff's Demand .......................................................................................8

    C.    Plaintiff's Complaint.....................................................................................9

        1.    The Day After His Demand Is Rejected By YRC's Board of Directors, Plaintiff Files A Complaint ...........................................9

        2.    Plaintiff Files An Amended Complaint After Solus Requests Permission To File A Motion To Dismiss ...................................9

ARGUMENT ..........................................................................................................10

    A.    Section 16(b) Is "Mechanical" And Subject To "Narrowly Drawn Limits" .........10

    B.    Execution Of The Blocker Provision On December 23, 2013 Immediately Reduced Solus' Beneficial Ownership To Below Ten Percent ...........................11

        1.    Blocker Provisions Are Commonly Found To Limit Beneficial Ownership.................................................................................11

        2.    The Blocker Provision Is Not Invalid Because Of Any Improper Purpose......................................................................................15

3.      Solus' Ability To Sell The Series A Notes Does Not Render The
        Blocker Provision Illusory ..........................................................................15

4.      The Blocker Provision Was Not Rendered Ineffective By The Fact
        That Solus Already Owned The Series A Notes When It Was
        Executed.......................................................................................................17

5.      The Blocker Provision Was Not Rendered Ineffective Because It
        Was Contracted For As Part Of The Stock Purchase Agreement..............18

C.      Solus' Execution Of The Stock Purchase Agreement Is Not Treated As A
        Sale................................................................................................................20

CONCLUSION.........................................................................................................................23

## <u>TABLE OF AUTHORITIES</u>

**<u>Cases</u>**                                                                                          **<u>Page</u>**

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
    493 F.3d 87 (2d Cir. 2007)...............................................................................3

*Decker v. Advantage Fund, Ltd.*,
    362 F.3d 593 (9th Cir. 2004) ........................................................................16

*In re Facebook, Inc., IPO Sec. & Derivative Litig.*,
    986 F. Supp. 2d 544 (S.D.N.Y. 2014)....................................................10, 11

*Foremost-McKesson, Inc. v. Provident Sec. Co.*,
    423 U.S. 232 (1976)......................................................................................11

*Global Intellicom v. Thomas Kernaghan & Co.*,
    99 Civ. 342, 1999 WL 544708 (S.D.N.Y. July 27, 1999) ...........................14

*Levner v. Prince Alwaleed*,
    61 F.3d 8 (2d Cir. 1995)...............................................................................14

*Levy v. Southbrook Int'l Inv., Ltd.*,
    No. 99 2000 WL 567008 (S.D.N.Y. May 10, 2000).....................................15

*Levy v. Southbrook Int'l Inv., Ltd.*,
    263 F.3d 10 (2d Cir. 2001)................................................................... *passim*

*Log On America, Inc. v. Promethean Asset Mgmt. L.L.C.*,
    223 F. Supp. 2d 435 (S.D.N.Y. 2001)......................................................14, 16

*Magma Power Co. v. Dow Chem. Co.*,
    136 F.3d 316 (2d Cir. 1998)............................................................11, 21, 22

*Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce*,
    694 F. Supp. 2d 287 (S.D.N.Y. 2010)..........................................................10

*Portnoy v. Revlon, Inc.*,
    650 F.2d 895 (7th Cir. 1981) .......................................................................20

*Reliance Elec. Co. v. Emerson Elec. Co.*,
    404 U.S. 418 (1972)............................................................................. *passim*

*Roth v. Goldman Sachs Grp., Inc.*,
    740 F.3d 865 (2d Cir. 2014)..........................................................................22

*Rothman v. Gregor*,
    220 F.3d 81 (2d Cir. 2000)..............................................................................3

*In re SLM Corp. Sec. Litig.,*
    740 F. Supp. 2d 542 (S.D.N.Y. 2010)................................................................3

*Schaffer v. CC Invs., LDC,*
    115 F. Supp. 2d 440 (S.D.N.Y. 2000)..............................................................14

*S. Cherry St. LLC v. Hennessee Grp. LLC,*
    573 F.3d 98 (2d Cir. 2009)...............................................................................10

*Segen v. CDR-Cookie Acquisitions, L.L.C.,*
    No. 05 Civ. 3509, 2006 WL 59550 (S.D.N.Y. Jan. 4, 2006), *reconsideration denied,*
    No. 13 CIV. 4016, 2014 WL 4384069 (S.D.N.Y. Sept. 4, 2014)......................11

*Stratte-McClure v. Morgan Stanley,*
    776 F.3d 94 (2d Cir. 2015)................................................................................3

*T-Bar Inc. v. Chatterjee,*
    693 F. Supp. 1 (S.D.N.Y. 1988)..................................................................19, 20


**Statutes**                                               **Page**

15 U.S.C. § 78p(b) ...............................................................................................10

17 C.F.R. § 240.13d-3 .............................................................................11, 12, 18

17 C.F.R. § 240.16a-1 .............................................................................11, 12, 21

17 C.F.R. § 240.16b ....................................................................................*passim*

17 C.F.R. § 240.16b-6 ......................................................................................20, 21

76 Fed. Reg. 34580 ..............................................................................................18

Solus Alternative Asset Management LP, Solus GP LLC, Solus Opportunities Fund 1 LP, Solus Opportunities Fund 2 LP, Sola Ltd, Solus Core Opportunities Master Fund Ltd, Ultra Master Ltd and Christopher Pucillo (collectively, "Solus") submit this memorandum of law in support of their motion to dismiss with prejudice Plaintiff's Amended Complaint for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6).

## PRELIMINARY STATEMENT

Roth's Section 16(b) claims fail because Solus was not a "more than ten percent" owner of YRC Worldwide Inc. ("YRC") when the transactions alleged in the Amended Complaint occurred in January 2014. As of December 12, 2013, Solus was deemed to be a beneficial owner of ten percent of YRC's equity securities based on its ownership of shares and convertible notes, and made two purchases thereafter. On December 23, 2013, however, Solus executed a "blocker provision" that prevented Solus from exercising its option to convert certain notes into YRC shares. At that point, under clear Second Circuit case law, Solus ceased to be a ten percent beneficial owner of YRC for purposes of Section 16(b) liability. Because Solus made no sale of YRC securities prior to December 23, the Blocker Provision is fatal to Roth's claims as a matter of law. These facts are readily apparent from the face of the Amended Complaint and the documents it references.

Roth's first Section 16(b) claim is based entirely on the premise that this Blocker Provision can be ignored. It cannot, for at least five reasons:

*First*, the Blocker Provision is enforceable and effective under Second Circuit precedent;

*Second*, the Blocker Provision was not executed for any improper purpose;

*Third*, the Blocker Provision was not rendered unenforceable by the fact that it permitted Solus to sell or transfer the notes to non-affiliated third parties;

*Fourth*, the Blocker Provision eliminated Solus' right to convert its presently-owned notes, when the convertibility rights of those notes had not yet been exercised; and

*Fifth and finally*, the Blocker Provision was not rendered ineffective because it appeared in an agreement which also provided for the purchase and sale of stock, where those transactions were subject to material conditions precedent that might never have been satisfied and, indeed, did not occur for many weeks after the effective date of the Blocker Provision.

As a desperate measure, the Amended Complaint also asserts that even if the Blocker Provision *is* effective, Solus has incurred Section 16(b) liability because the execution of the Blocker Provision itself constituted a sale. However, SEC Rules and a string of cases demonstrate that the decision not to exercise an option is not a sale for Section 16(b) purposes. Unsurprisingly, Plaintiff offers no authority for his contrary proposition.

Accordingly, Plaintiff's claims are not viable. The Court should therefore grant this motion to dismiss.

## BACKGROUND

Solus is a privately held investment advisor that specializes in event-driven, distressed and special situation opportunities. Based in New York City, Solus currently manages approximately $6 billion in assets for its investors. Christopher Pucillo is the Chief Executive Officer and Chief Investment Officer of Solus Alternative Asset Management LP.

### A.    The Transactions At Issue

#### 1.    Solus Invests In YRC Worldwide Inc.

On December 3, 2013, YRC, a Kansas-based logistics company that provides trucking services to industrial, commercial, and retail customers, issued a supplemental prospectus which stated that YRC "face[d] significant liquidity challenges in the near term, which could adversely affect [its] financial condition," and that "[t]o the extent [YRC was] not able to extend [its]

2

agreements [with unionized employees] on acceptable terms, [YRC] may be unable to restructure or refinance the portions of our debt which will mature in September of 2014 and March of 2015."[1]  (YRC, Prospectus Supplement (Form 424B5) at S-4, S-11 (Dec. 3, 2013).)

As a specialist in distressed debt situations, Solus saw an opportunity to invest.  On December 10, 2013, Solus filed a beneficial ownership report with the SEC, disclosing that it beneficially owned 9.57% of YRC's outstanding equity securities.  (Solus, Beneficial Ownership Report (Sched. 13D) Am. No. 1 (Dec. 10, 2013).)  Solus' beneficial ownership consisted of YRC common stock, 10% Series A Convertible Senior Secured Notes ("Series A Notes"), and 10% Series B Convertible Senior Secured Notes ("Series B Notes").  The Series A and B Notes were each, in accordance with their terms, convertible to YRC common stock.  (Am. Cmpl. ¶ 20.)  Under SEC rules, because of that convertibility, Solus was considered to "beneficially own" the YRC common stock into which the Series A and B Notes could be converted.  (*See id.*)

On December 12, 2013, Solus became a beneficial owner of over ten percent of YRC's common stock when it purchased 89,608 shares of YRC common stock.  (Solus, Beneficial Ownership Report (Sched. 13D) Am. No. 2 (Dec. 13, 2013).)  Also on December 12, 2013, Solus

---

[1]    When considering a motion to dismiss for failure to state a claim, the Court may "consider any written instrument attached to the complaint as an exhibit or any statements or documents incorporated in it by reference, as well as public disclosure documents required by law to be, and that have been, filed with the SEC, and documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit."  *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 100 (2d Cir. 2015) (alternation and citation omitted)*; ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (same); *Rothman v. Gregor*, 220 F.3d 81, 88-89 (2d Cir. 2000) (same); *In re SLM Corp. Sec. Litig.*, 740 F. Supp. 2d 542, 554 (S.D.N.Y. 2010) (same) (quoting *ATSI Commc'ns*).

YRC's December 3, 2013 Supplemental Prospectus, Solus' Schedule 13D Report and subsequent Amendments, the Stock Purchase Agreement, and the Exchange Agreement were, and were required by law to be, filed with the SEC.  Moreover, the Stock Purchase Agreement is incorporated into the Amended Complaint (*see* Am. Cmpl. ¶ 21) and the Amended Complaint relies on Solus' Schedule 13D Report and Amendments for the transaction information contained therein (*see id.* ¶¶ 19, 21, 22, 32-37, 40, 42).

purchased Series A Notes in a principal amount of $15.1 million, and on December 13, 2013, it purchased Series B Notes in a principal amount of approximately $2.41 million. (Am. Cmpl. ¶ 19.) At the close of business on December 13, 2013, Solus beneficially owned 189,608 shares of YRC common stock, and had the option to convert the Series A and Series B Notes for an additional 1,641,449 shares of common stock. (*Id.*) As a result, Solus was "deemed to beneficially own 1,831,057 shares of the Common Stock (representing approximately 14.56% of the Issuer's outstanding shares of Common Stock)" on a fully diluted basis. (Solus, Beneficial Ownership Report (Sched. 13D) Am. No. 2 (Dec. 13, 2013).)

> ### 2. YRC Negotiates Restructuring Agreements With Its Creditors

On December 23, 2013, YRC signed restructuring agreements with individual investors, including Solus. (Am. Cmpl. ¶ 21 & ¶ 22 n.1.) These Stock Purchase Agreements and Exchange Agreements (the "Restructuring Agreements") stated that if YRC and its investors were successful in meeting several material conditions precedent, each of the signatory investors would purchase shares of YRC common stock, would sell any Series A Notes to YRC in exchange for cash, and would exchange any Series B Notes for shares of YRC common stock. (*Id.* at ¶ 22 & *id.* n.1.)

> ### 3. Execution Of The Blocker Provision Immediately Reduces Solus' Beneficial Ownership Of YRC Stock To Below Ten Percent

Solus' Stock Purchase Agreement included a "blocker" provision or "conversion cap," whereby Solus "irrevocably agree[d] not to convert, and . . . not [to] permit any of its controlled Affiliates to convert, any of the Series A Notes as listed on Annex III hereto into shares of Common Stock in accordance with Section 10.01 of the indenture governing the Series A Notes and . . . not [to] otherwise sell, assign or otherwise transfer any of its Series A Notes" (the "Blocker Provision"). (Ex. A, Stock Purchase Agreement ("SPA"), § 4(*l*), Ex. 5 to Solus,

Beneficial Ownership Report (Sched. 13D) Am. No. 3 (Dec. 24, 2013); *see also* Am. Cmpl. ¶ 21.) The Blocker Provision (except its prohibition of sales, assignments, or transfers) would survive any termination of the Stock Purchase Agreement. (Ex. A, SPA, § 4(*l*).) The Blocker Provision, unlike the remainder of the relevant obligations of the Restructuring Agreements (which were dependent on conditions precedent), was both irrevocable and effective immediately. (*Id.*)

In accordance with its reporting obligations and the operation of the Blocker Provision, Solus reported to the SEC that "[p]ursuant to Section 4(*l*) of the Stock Purchase Agreement . . . [Solus] irrevocably agreed not to convert, and agreed to not permit any of its controlled affiliates to convert, any of the Series A Notes held by it into shares of Common Stock and agreed to not otherwise sell, assign or otherwise transfer any of its Series A Notes." (Solus, Beneficial Ownership Report (Sched. 13D) Am. No. 3 (Dec. 24, 2013).) The Schedule 13D Amendment explained that "[a]s a result [of the Blocker Provision, Solus is] not deemed to beneficially own any of the shares of Common Stock that otherwise could have been issued upon conversion of the Series A Notes." (*Id.*) Accordingly, Solus reported that as of December 24, 2013, it beneficially owned just 8.43% of YRC's outstanding equity securities—below the ten percent threshold imposed by Section 16(b). (*Id.*)

> 4.     The Other Obligations Contained In The Restructuring Agreements Are Subject to Material Conditions Precedent

Unlike the Blocker Provision, the other relevant obligations in the Restructuring Agreements—including YRC's obligations to issue stock (Ex. A, SPA, § 1(a)) and the noteholders' obligations to exchange or sell their notes (*id.* at §§ 4(*l*), 4(m))—were only effective *if* the Restructuring Agreements closed. The Stock Purchase Agreement made clear that

> The Closing shall take place . . . on the second (2nd) business day
> after each Buyer has confirmed that all of the conditions set forth

5

> in Section 6 (other than such conditions that are only capable of
> being satisfied on the Closing Date), and the Company has
> confirmed that all of the conditions set forth in Section 5 (other
> than such conditions that are only capable of being satisfied on the
> Closing Date), have been satisfied . . .

(*Id*. at § 1(c).)  As such, the other obligations in each Restructuring Agreement were conditional upon each party's confirmation that multiple conditions precedent had been met.  (*Compare id.* (defining Closing Date) & *id.* at § 1(a) ("on the Closing Date (as defined below), the Company shall issue and sell . . . shares of Common Stock . . .").)

As disclosed by Solus in its SEC filings, the material conditions precedent to the closing of the Restructuring Agreements included, *inter alia*, (i) the approval of an amended collective bargaining agreement by YRC's employees; (ii) YRC's negotiation of an "amendment and extension of the Issuer's Amended and Restated Contribution Deferral Agreement, with respect to at least 90% of the obligations, to December 31, 2019;" (iii) YRC's receipt of proceeds of at least $250 million from its issuance of additional common and preferred stock; (iv) the agreement of holders of Series B Notes to exchange or convert a minimum of $45 million in Series B Notes; and (v) that "[e]ach Other Purchaser that holds Series B Notes shall have agreed to concurrently with or prior to Closing convert all of its Series B Notes pursuant to and in accordance with the terms of the Series B Indenture or exchange all of its Series B Notes pursuant to the Series B Notes Exchange."  (Ex. A, SPA, §§ 5, 6; *see also* Am. Cmpl. ¶ 22 n.1.) **If any one of these conditions did not occur, the Restructuring Agreements would not close.** In addition, if the closing had not occurred by February 13, 2014 (or if certain other closing contingencies were not met), each of the investors had the right to terminate its Stock Purchase Agreement.  (Ex. A, SPA, § 7.)

5.      YRC's New Collective Bargaining Agreement Is Voted Down By Its Employees

While executing the Restructuring Agreements with its investors, YRC was required to seek its employees' approval of a new collective bargaining agreement, which was a condition precedent to the closing of the Restructuring Agreements.  (*See id.* at § 6(b)(i).)  After a collective bargaining agreement was finalized with union management, it was put to a membership vote.  However, on January 10, 2014, YRC filed with the SEC a report stating that union employees had rejected the proposed agreement.  (YRC, Current Report (Form 8-K) (Jan. 10, 2014).)

With the conditions precedent as yet unmet and YRC's future unclear, on January 10, 2014, Solus sold 68,000 shares of YRC common stock; on January 21, Solus sold 40,000 shares; and on January 22, Solus sold a further 81,608 shares.  (Am. Cmpl. ¶ 34; Solus, Beneficial Ownership Report (Sched. 13D) Am. No. 5 (Jan. 28, 2014).)  In total, these sales further reduced Solus' beneficial ownership percentage to 6.82%.  (Solus, Beneficial Ownership Report (Sched. 13D) Am. No. 5 (Jan. 28, 2014). )

6.      YRC Negotiates A Second Collective Bargaining Agreement With Its Employees

On January 21, 2014, YRC and union management finalized a new collective bargaining agreement, which could then be put before employees for ratification.  However, the Restructuring Agreements still included reference to the original union agreement.  (Ex. A, SPA, § 6(b)(i).)  As such, YRC sought and obtained amendment of the Restructuring Agreements, to remove the original reference and add as a new condition precedent the ratification by employees of this second agreement.  (Solus, Beneficial Ownership Report (Sched. 13D) Am. No. 5 (Jan. 28, 2014).)  The second collective bargaining agreement was put to a vote days later.  On

7

January 27, 2014, YRC announced that the amended agreement had been approved by union

vote.  (YRC, Current Report (Form 8-K) (Jan. 27, 2014).)

> 7.    YRC's Restructuring Agreements Close on January 31, 2014

Finally, after the conditions precedents were met, YRC's Restructuring Agreements with

its investors closed on January 31, 2014 (Am. Cmpl. ¶ 23)—more than a month after the Blocker

Provision became effective.  On February 3, 2014, in accordance with its reporting obligations,

Solus filed what was now Amendment No. 6 to its Schedule 13D, stating that "[o]n January 31,

2014 (the 'Closing Date'), the transactions contemplated by the Stock Purchase Agreement were

consummated and [Solus] acquired 1,666,667 shares of Common Stock for an aggregate

consideration of approximately $25,000,000."  (Solus, Beneficial Ownership Report (Sched.

13D) Am. No. 6 (Feb. 3, 2014).)  On that same date, "the transactions contemplated by the

Exchange Agreement were consummated and [Solus] acquired 880,022 shares of Common Stock

in exchange for $12,819,310 principal amount of the Series B Notes."  (*Id.*)  Solus reported that

as a result of these purchases, as of February 3, 2014, it beneficially owned 8.92% of YRC's

outstanding equity securities.  (*Id.*)

**B.    Plaintiff's Demand**

More than eight months later, on October 6, 2014, Roth, purportedly a YRC shareholder

(Am. Cmpl. ¶ 1), complained to YRC's Board of Directors about Solus' alleged short-swing

profits.  (*Id.* at ¶ 43.)  YRC's Board of Directors investigated Roth's claim and determined, as it

informed him on December 3, 2014, that it was not in the best interests of the company and its

shareholders to take any further action.  (*Id.*)

C.     **Plaintiff's Complaint**

      1.    The Day After His Demand Is Rejected By YRC's Board of Directors, Plaintiff Files A Complaint

On December 4, 2014, Roth filed his original Complaint, alleging that on December 23, 2013, "the Solus Group entered into both a Stock Purchase Agreement and an Exchange Agreement" with YRC, which constituted sales, and that Solus' purchases of YRC securities on December 12 and December 13 could be matched with these purported December 23 sales as disgorgeable profits under Section 16(b).  (ECF No. 1, Cmpl. ¶ 16.)  The Complaint thus demanded that Solus disgorge "short-swing profits of at least $4.5 million."  (*Id.* at ¶ 17.)  Tellingly, the Complaint did not take account of the Blocker Provision in any way.

      2.    Plaintiff Files An Amended Complaint After Solus Requests Permission To File A Motion To Dismiss

After Solus requested (and was subsequently granted) permission to file this motion to dismiss, Roth notified the Court that he intended to amend his complaint.  (ECF Nos. 24, 27, 29.) That amendment was filed on February 25, 2015.  (ECF No. 31.)  Roth now makes allegations regarding the previously ignored Blocker Provision.  Roth first argues that the Blocker Provision was not effective, for what he claims are four sufficient reasons: (i) the Blocker Provision was contracted for while Solus was a beneficial owner of ten percent of YRC's equity securities (Am. Cmpl. ¶ 24); (ii) the Blocker Provision was contracted for at the same time Solus agreed to purchases and sales in YRC securities (*id.*); (iii) Solus agreed to the Blocker Provision with the "improper purpose of eliminating the convertibility feature of [its] Series A Notes" (*id.*); and (iv) Solus retained the right to sell its Series A Notes (*id.* at ¶ 29).  Because the Blocker Provision is purportedly ineffective, Roth argues that Solus incurred Section 16(b) liability for transactions completed between December 12, 2013, and January 31, 2014, when the Restructuring Agreements closed.  In the alternative, Roth argues that even if the Blocker Provision is

effective, it constituted a sale of YRC stock.  (*Id.* at ¶ 32.)  The Amended Complaint demands that Solus disgorge short-swing profits of at least $4,531,966.80.  (*Id.* at ¶ 40.)

For the reasons described below, the Blocker Provision was effective and the Amended Complaint fails to state a claim.

## ARGUMENT

"[O]n a motion to dismiss . . .  dismissal is appropriate if the plaintiff can prove no set of facts that would entitle him to relief."  *Levy v. Southbrook Int'l Invs., Ltd.*, 263 F.3d 10, 14 (2d Cir. 2001) (citation omitted).  "Determining whether a complaint states a plausible claim for relief will be a context specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce*, 694 F. Supp. 2d 287, 296-97 (S.D.N.Y. 2010) (alteration omitted) (quoting *S. Cherry St. LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 110 (2d Cir. 2009)).  In this case, even "accept[ing] all factual allegations as true and draw[ing] all inferences in the plaintiff's favor," *Levy*, 263 F.3d at 14, there is no set of facts that would entitle Roth to the relief he seeks.  As such, the Amended Complaint must be dismissed.

## A.    Section 16(b) Is "Mechanical" And Subject To "Narrowly Drawn Limits"

Section 16(b) was intended to "curb the evils of insider trading."  *Reliance Elec. Co. v. Emerson Elec. Co.*, 404 U.S. 418, 422 (1972).  To do so, Congress "chose a relatively arbitrary rule capable of easy administration," which "did not reach every transaction in which an investor actually relies on inside information."  *Id.*  As such, the Supreme Court has specifically cautioned that a Section 16(b) plaintiff may not rely on "policy arguments" to attempt to evade the "mechanical quality of the statute."[2]  *Id.* at 425, 427.

---

[2]    Because Section 16(b) operates as a "blunt instrument," courts have repeatedly recognized that its strict liability regime must be confined within very "narrowly drawn limits."

Specifically, Section 16(b) of the Exchange Act of 1933 states that "any profit realized by [a beneficial owner of more than 10 percent of any class of any equity security] from any purchase and sale, or any sale and purchase, of any equity security . . . within any period of less than six months . . . shall inure to and be recoverable by the issuer."  15 U.S.C. § 78p(b). However, it is clear that Section 16(b) does not "cover any transaction where such beneficial owner was not such *both* at the time of the purchase and sale, or the sale and purchase, of the security"  *Id.* (emphasis added).  Therefore, "liability under Section 16(b) does not attach unless the plaintiff proves that there was (1) a purchase and (2) a sale of securities (3) by . . . a shareholder who owns more than ten percent of any one class of the issuer's securities (4) within a six-month period."  *Gwozdzinsky v. Zell/Chilmark Fund, L.P.*, 156 F.3d 305, 308 (2d Cir. 1998).  Here, Solus made no sales while it was a ten percent beneficial owner of YRC stock from December 12, 2013, to December 23, 2013.  As such, Solus cannot be liable under Section 16(b).

**B.      Execution Of The Blocker Provision On December 23, 2013 Immediately Reduced Solus' Beneficial Ownership To Below Ten Percent**

1.      Blocker Provisions Are Commonly Found To Limit Beneficial Ownership

SEC Rule 16a-1 states that "for purposes of determining whether a person is a beneficial owner of more than ten percent of any class of equity securities . . . the term 'beneficial owner' shall mean any person who is deemed a beneficial owner pursuant to Section 13(d) of the Act and the rules promulgated thereunder."  17 C.F.R. § 240.16a-1(a)(1).  SEC Rule 13d-3, in turn, states that "[a] person shall be deemed to be the beneficial owner of a security . . . if that person

---

*In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 544, 551 (S.D.N.Y. 2014) (citing *Magma Power Co. v. Dow Chem. Co.,* 136 F.3d 316, 321 (2d Cir. 1998), *Foremost-McKesson, Inc. v. Provident Sec. Co.,* 423 U.S. 232, 251 (1976); *Segen v. CDR-Cookie Acquisitions, L.L.C.,* No. 05 Civ. 3509, 2006 WL 59550, at *5 (S.D.N.Y. Jan. 4, 2006)), *reconsideration denied,* No. 13 CIV. 4016, 2014 WL 4384069 (S.D.N.Y. Sept. 4, 2014).  Roth's argument is clearly beyond those limits.

has the right to acquire beneficial ownership of such security . . . within sixty days, including but not limited to any right to acquire . . . (B) through the conversion of a security." 17 C.F.R. § 240.13d-3.

Under Rule 16a-1 and Rule 13d-3, Solus became a ten percent beneficial owner of YRC securities on December 12, 2013, as a result of its ownership of YRC common stock and its right to acquire YRC common stock upon the conversion of its Series A and Series B Notes. Solus' directly owned stock was not sufficient to make it a ten percent owner; it was only by including Solus' "right to acquire beneficial ownership . . . through the conversion of a security," 17 C.F.R. § 240.13d-3, that Solus exceeded the Section 16(b) ten percent threshold.

The Blocker Provision, immediately effective upon execution on December 23, 2013, expressly eliminated Solus' ability to convert its Series A Notes. Accordingly, it eliminated Solus' status as a "deemed" owner under Rule 16a-1 and Rule 13d-3. Specifically, the Blocker Provision provided that Solus

> *irrevocably agrees not to convert*, and shall not permit any of its controlled Affiliates to convert, *any of the Series A Notes as listed on Annex III hereto into shares of Common Stock* in accordance with Section 10.01 of the indenture governing the Series A Notes and shall not otherwise sell, assign or otherwise transfer any of its Series A Notes. *This Section 4(l) shall survive termination of this Agreement* except that the immediately preceding sentence shall not survive any such termination in respect of sales, assignments and transfers to any person that is not an Affiliate of such Buyer or fund or account managed or advised by such Buyer or an Affiliate of such Buyer.

(Ex. A, SPA, § 4(*l*) (emphasis added).) As Solus had agreed "not to convert . . . any of [its] Series A Notes," *id.*, Solus' beneficial ownership of YRC securities was now limited to its 189,608 shares of directly owned YRC common stock, and the 800,715 shares of YRC common stock which Solus had the right to acquire through the conversion of its Series B Notes. (Solus,

Beneficial Ownership Report (Sched. 13D) Am. No. 3 (Dec. 24, 2013).)  As of December 23, 2013, Solus beneficially owned just 8.43% of YRC's outstanding securities.  (*Id.*)

Blocker provisions (or "conversion caps") such as the one included in the Stock Purchase Agreement are both common and enforceable.  For example, in *Levy v. Southbrook International Investments, Ltd.*, defendant Southbrook was accused of violating Section 16(b) by completing purchases and sales while Southbrook was "a more than 10% beneficial owner of ImmunoGen [Inc.]'s outstanding common stock by virtue of Southbrook's ownership of ImmunoGen convertible preferred stock."  263 F.3d 10, 13 (2d Cir. 2001).  Southbrook moved to dismiss the complaint, arguing that it was not a ten percent beneficial owner because its agreement with ImmunoGen to purchase the convertible shares included a "conversion cap" that stated that "[t]he Purchaser may not use its ability to convert Shares hereunder . . . to the extent that such conversion or exercise would result in the Purchaser owning more than 4.9% of the outstanding shares of the Common Stock."  *Id.*

The Second Circuit affirmed the district court's grant of Southbrook's motion to dismiss, holding that "an investor subject to an effective, binding conversion cap of 4.9% is not a more than 10% beneficial owner of the underlying equity stock."  *Id.* at 14.  In doing so, the Court noted that the "SEC's position . . . supports [Southbrook's] reading of . . . Rule [16a-1]."  *Id.* at 15.  "[A]ccording to the SEC, a holder of convertible securities that is subject to a binding conversion cap is not a more than 10% beneficial owner of the underlying equity securities" because the investor "does not have the 'right to acquire' investment power over any of the convertible shares."  *Id.* at 15.  The Second Circuit held the SEC's reading "reasonable."  *Id.* at 16.

Similarly, in *Levner v. Prince Alwaleed*, the Second Circuit found that the defendant's convertible shares were not "presently convertible" because they were subject to an agreement which prohibited the defendant from "in any way acquir[ing], offer[ing] or propos[ing] to acquire or agree[ing] to acquire Beneficial Ownership of any Voting Securities . . . if, after such acquisition, the aggregate percentage of Total Voting Power with respect to Voting Securities Beneficially Owned by the Purchaser would exceed 10%." 61 F.3d 8, 9-10 (2d Cir. 1995). As such, the defendant could not have incurred liability under Section 16(b). The Second Circuit affirmed the district court's grant of the defendant's motion to dismiss.

This Court also enforced a blocker provision in *Log On America, Inc. v. Promethean Asset Management L.L.C.*, where the Court reviewed a provision which stated that "no holder of Preferred Shares shall have the right to convert Preferred Shares in excess of that number of Preferred Shares which, upon giving effect to such conversion, would cause the aggregate number of shares of Common Stock beneficially owned by the holder and its affiliates to exceed 4.99% of the total outstanding shares of Common Stock following such conversion." 223 F. Supp. 2d 435, 447-48 (S.D.N.Y. 2001). The Court found that the defendant was not a beneficial owner of more than 4.99% of the issuer's securities, despite its ownership of warrants which, if freely convertible, would have exceeded that amount. *Id.*; *see also Schaffer v. CC Invs., LDC*, 115 F. Supp. 2d 440, 443 (S.D.N.Y. 2000) (conversion cap held valid); *Global Intellicom v. Thomas Kernaghan & Co.*, 99 Civ. 342, 1999 WL 544708 (S.D.N.Y. July 27, 1999) (same).

Just as in *Levy*, *Levner*, and *Log On*, Solus' execution of the Blocker Provision eliminated its "right to acquire investment power" over shares through the exercise of its Series A Notes as of December 23, 2013. *See Levy*, 263 F.3d at 15. As Plaintiffs do not allege that

14

Solus made any sales of YRC securities before that date (*see* Am. Cmpl. ¶ 32-34), Solus cannot be liable under Section 16(b).

> 2.    The Blocker Provision Is Not Invalid Because Of Any Improper Purpose

Plaintiff's first argument against the validity of the Blocker Provision is that the Blocker Provision was ineffective because it was entered into with the purpose of avoiding liability under Section 16(b).  (Am. Cmpl. ¶ 24; ECF No. 36 at 3.)  Even assuming this was Solus' (and YRC's) "purpose," Plaintiff has not alleged—or even attempted to allege—why that would be "improper."

The Supreme Court has made clear that "[l]iability cannot be imposed simply because the investor structured his transaction with the intent of avoiding liability under [Section] 16(b).  The question is, rather, whether the method used to 'avoid' liability is one permitted by the statute." *Reliance,* 404 U.S. at 422.  The Second Circuit has also firmly rejected attempts to bring transactions like this one "within the ambit of Section 16 by invoking the policy argument that it is the type of speculative, short-term profit-taking the statute was designed to prevent." *Gwozdzinsky*, 156 F.3d at 310.  Blocker provisions limiting the convertibility of securities "have been upheld as a legitimate means of structuring a transaction to avoid § 16(b) liability."  *Levy v. Southbrook Int'l Inv., Ltd.*, No. 99 CIV. 1480, 2000 WL 567008, at \*4 (S.D.N.Y. May 10, 2000), *aff'd* 263 F.3d at 10.  As such, Plaintiff's purpose argument is unavailing.

> 3.    Solus' Ability To Sell The Series A Notes Does Not Render The Blocker Provision Illusory

The Amended Complaint also alleges that the Blocker Provision is a "sham" because "the restrictions on [the] convertibility [of the Series A Notes] would not survive the termination of the Stock Purchase Agreement in cases where the Solus Group transferred its Series A Notes to unaffiliated third parties."  (Am. Cmpl. ¶ 29.)  Plaintiff thus claims that, because the Series A

Notes were not cancelled and retained their convertability *for entities other than Solus*, the Blocker Provision was ineffective.  (*Id.*)

Despite Plaintiff's protestations, courts have *routinely* upheld blocker provisions which preserve conversion rights for other holders.  For example, in *Levy*, the Second Circuit enforced a conversion cap which stated that "*[t]he Purchaser* may not use its ability to convert Shares hereunder or under the terms of the Vote Certificates or to exercise its right to acquire shares of common stock under the Warrants to the extent that such conversion or exercise *would result in the Purchaser owning* more than 4.9% of the outstanding shares of the Common Stock."  263 F.3d at 13 (emphasis added).  This blocker provision did not restrict the holder's ability to sell the warrants.

The Ninth Circuit similarly found that the defendants had not reached ten percent ownership where "the convertible security (preferred stock) that they held was subject to a conversion cap that would bar conversion *once the owner reached* a threshold of 4.9% ownership."  *Decker v. Advantage Fund, Ltd.*, 362 F.3d 593, 596-97 (9th Cir. 2004) (emphasis added).  The preferred stock could be freely converted by entities that would not reach that threshold, and the agreement contained no limitation on a blocked entity's ability to sell.

Similarly, this Court has enforced a conversion cap which stated that "[t]he Company shall not effect any conversion of Preferred Shares and no holder of Preferred Shares shall have the right to convert Preferred Shares in excess of that number of Preferred Shares which, upon giving effect to such conversion, would cause the aggregate number of shares of Common Stock *beneficially owned by the holder and its affiliates* to exceed 4.99% of the total outstanding shares of Common Stock following such conversion."  *Log On Am.*, 223 F. Supp. 2d at 448 (emphasis

added).  The terms of this blocker provision allow the conversion of these shares by other

parties—and do not restrict the right of blocked entities to sell to other parties.

Each of these blocker provisions allowed, as does Solus' Blocker Provision, the subject

entity to transfer the convertible stock to third parties for value.  The key in each of the cases is

that the *entity subject to the blocker provision* could not convert securities such that it became a

ten percent beneficial owner.  There is simply no requirement that entities *not* subject to the

blocker provision be similarly forbidden to convert those same securities.  Plaintiff's attempt to

claim there is such a requirement under the statute should be denied.

4.    <u>The Blocker Provision Was Not Rendered Ineffective By The Fact That<br>Solus Already Owned The Series A Notes When It Was Executed</u>

In another attempt to evade the Second Circuit's clear precedent on the enforceability of

blocker provisions, the Amended Complaint argues that Solus' Blocker Provision was ineffective

because it was contracted for "AFTER defendants had attained the status of statutory insiders."

(Am. Cmpl. ¶ 24 (emphasis in original).)  Plaintiff makes no argument—and has not cited any

case in either of its complaints or its letter to the Court—to accompany its bald assertion that this

distinction should matter.  (*See* ECF Nos. 1, 31, 36.)

Plaintiff's argument is predicated on the fact that Solus formed the intent to divest itself

of beneficial ownership after it became a ten percent owner.  That argument, however, has been

expressly rejected by the Supreme Court.  The plaintiff in *Reliance Electric* argued that where a

statutory insider made two sales of stock, the first of which lowered his ownership stake below

ten percent, the second sale should nonetheless be subject to Section 16(b) liability because the

sales were "interrelated parts of a single plan" conceived while the defendant owned ten percent

of the company's securities.  404 U.S. at 423.  The Supreme Court rejected that argument and

refused to find the defendant liable, holding that to find liability based on when the "plan" was

17

developed—instead of the date of purchases and sales—would contravene the text of Section 16(b).  *Id.* at 423-24.  As such, the fact that Solus already owned the Series A Notes when it negotiated and executed the Blocker Provision is immaterial as a matter of law.[3]

5.    The Blocker Provision Was Not Rendered Ineffective Because It Was Contracted For As Part Of The Stock Purchase Agreement

Finally, Plaintiff argues that Solus' Blocker Provision was ineffective because "there was no separation of the transactions" by which Solus' Blocker Provision divested it of ten percent ownership and the transactions by which Solus purchased YRC common stock and exchanged its Series A and Series B Notes.  (ECF No. 36 at 3.)  A review of the terms of the transaction—and Plaintiff's own allegations—demonstrates that Plaintiff is simply incorrect.

As discussed above, the Blocker Provision contained in the Stock Purchase Agreement was irrevocable and operated immediately.  (Ex. A, SPA, § 4(*l*).)  As of the date of the Restructuring Agreements, Solus no longer had any right to convert its Series A Notes.

---

[3]    A review of SEC Regulations explains why this outcome is in harmony with the SEC's rationale.  In its Release accompanying its readoption without amendment of Rule 13d-3 in 2011, the SEC stated that "[a] right to acquire an equity security within 60 days is comparable to direct ownership of the equity security because direct ownership is contingent, in some cases, only upon the exercise of that right and *may result in the potential to change or influence control of the issuer upon acquisition of the equity security for which the right is exercisable*."  Beneficial Ownership Reporting Requirements and Security-Based Swaps, 76 Fed. Reg. 34580, 34585 (June 14, 2011) (emphasis added).  In sum, ownership of a readily-convertible security is tantamount to ownership of the security itself because once that conversion right *has been exercised*, the owner can influence the issuer.  Prior to the execution of the Blocker Provision, Solus thus arguably had the "*potential* to change or influence control of the issuer *upon acquisition of the equity security*."  *Id.*  Solus' execution of the Blocker Provision eliminated this potential—without that potential ever being realized—because it eliminated the right to acquire.

In contrast, there were numerous material conditions precedent to the occurrence of the share issuance, Series A Note repurchase, and Series B Note exchange about which Plaintiff complains.  Among the conditions precedent to the closings were, *inter alia*:

- The approval by YRC's union of a new collective bargaining agreement (*id.* at § 6(b));

- YRC's extension of 90% of certain of its debt obligations to December 31, 2019 (*id.* at § 6(c));

- That YRC will have received at least $250 million in return for its new share issuance (*id.* at § 6(p)(i));

- That Series B noteholders will have agreed, in total, to exchange or convert at least $45 million in Series B Notes (*id.* at § 6(p)(ii)); and

- That each other signatory investor will have agreed to convert all of their Series B Notes (*id.* at § 6(q)).

These conditions precedent were by no means certain to be fulfilled, and their eventual fulfillment was not in the control of Solus, or even YRC.  In fact, because YRC's employees rejected the first collective bargaining agreement, the conditions precedent to the original Restructuring Agreements *were never fulfilled*.  Only when the Restructuring Agreements were amended to include the revised union agreement (*see* Solus, Beneficial Ownership Report (Sched. 13D) Am. No. 5 (Jan. 28, 2014))—and when that union agreement passed an employee vote—could the conditions precedent be met.  In addition, neither YRC nor Solus could ensure that the proceeds of the share issuance (Ex. A, SPA, § 6(p)(i)) or the amount of the Series B Note exchange (*id.* at § 6(p)(ii)) would be met.  If *any* of those conditions precedent had not occurred, there would have been no closing, and no purchases or sales on January 31, 2014.

"Where a contract for the purchase of a security requires the occurrence of a condition precedent to its effectiveness, a purchase does not occur until the fulfillment of that condition precedent."  *T-Bar Inc. v. Chatterjee*, 693 F. Supp. 1, 6 (S.D.N.Y. 1988) (finding that purchase

of debentures could not occur until final prospectus was delivered, which was outside of six-month window for Section 16(b) liability) (citations omitted). Similarly, in *Portnoy v. Revlon, Inc.*, 650 F.2d 895 (7th Cir. 1981), the Seventh Circuit held that execution of an agreement to dispose of shares was not a Section 16(b) "sale" where the agreement included significant conditions precedent to closing, including the issuance of an IRS opinion, a minimal number of share repurchase claims, and the negotiation of certain agreements with defendant's employees. 650 F.2d at 900.

Accordingly, as a matter of law the closing of the Restructuring Agreements did not occur until January 31, 2014—***a fact Plaintiff admits in his Amended Complaint***. (Am. Cmpl. ¶ 23 & ¶ 34 ("[T]he Solus Group . . . *sold* $29,589,922 aggregate principal amount of the Company's Series A Notes *on January 31, 2014*; and . . . *exchanged* $12,819,310 aggregate principal amount of the Company's Series B Notes *on January 31, 2014*.") (emphasis added).) As the Blocker Provision had reduced Solus' beneficial ownership below ten percent as of December 23, 2013, Solus could not incur Section 16(b) liability for sales that occurred some six weeks later.

### C.    Solus' Execution Of The Stock Purchase Agreement Is Not Treated As A Sale

Finally, Plaintiff's Amended Complaint raises an alternative argument that "[i]f the Blocker Provision is held to be effective, then the Solus Group's execution of the December 23, 2013 Stock Purchase Agreement, which included the Blocker Provision, represented a decrease in the Solus Group's call equivalent position of 840,734 shares of Common Stock and, is therefore treated as a sale of such number of shares under SEC Rule 16b-6(a)." (Am. Cmpl. ¶ 32.) Plaintiff's alternative argument—that electing not to make a purchase is in fact a sale—also fails.

20

Solus' purchase of Series A Notes gave Solus the option to convert those Notes into YRC stock. (Am. Cmpl. ¶ 20.) The Series A Notes were thus a "call equivalent position," defined by the SEC as "a derivative security position that increases in value as the value of the underlying equity increases." 17 C.F.R. § 240.16a-1(b). As the value of YRC's common stock rose, so too did the value of Solus' right to convert its Series A Notes into YRC common stock. The execution of the Blocker Provision, by which Solus "irrevocably agree[d] not to convert" those Notes, (Ex. A, SPA, § 4(*l*)), was therefore the "disposition or closing of a long derivative security position, as a result of cancellation or expiration," 17 C.F.R. § 240.16b-6(d). According to SEC Rule 16b-6(d), such a disposition "shall be exempt from section 16(b) of the Act where no value is received from the cancellation or expiration." *Id.*

There is no allegation—nor could there be—that Solus was paid for the execution of the Blocker Provision. Instead, Plaintiff claims that the purchases and sales included in the Restructuring Agreements provided consideration for the Blocker Provision, which should be valued using "the closing price of the Common Stock on December 23, 2013." (Am. Cmpl. ¶ 32; ECF No. 36 at 2.) However, Plaintiff's argument fails to acknowledge the basic structure of the Restructuring Agreements. As explained above, as a result of the numerous conditions precedent to the closing of the Restructuring Agreements, the purchases and sales contemplated therein almost *did not occur*. However, the logic of the Plaintiff's position requires that, had the Restructuring Agreements failed and Solus not received what Plaintiff argues was the consideration, Solus *would still* be liable because it agreed to the Blocker Provision. This is plainly irrational.

Moreover, even if Solus *did* receive consideration for waiving convertibility, the receipt of this consideration would not subject it to liability. In *Magma Power Co. v. Dow Chem. Co.*,

the Second Circuit confronted a case in which a plaintiff attempted to impose Section 16(b)

liability on a defendant who, *inter alia*, "never exercised its option to buy back the [issuer's]

shares." 136 F.3d 316, 325 (2d Cir. 1998). The plaintiff, like Roth here, argued that by allowing

the options to lapse, the defendant had in effect "sold" the underlying securities. The Second

Circuit disagreed, holding that

> ***[a] failure to purchase, however, is not a sale. Were this not the
> case, virtually every insider transaction could give rise to liability.***
> Every day, an insider has the opportunity to buy shares at the
> market price. If the foregoing of that opportunity constitutes a
> sale, then every occasion upon which the market for the stock
> exceeds the purchase price within six months of an insider
> purchase, the insider would be deemed to have sold at such higher
> prices, creating illegal profit.

*Id.* (emphasis added).[4]

Just as did the plaintiff in *Magma Power*, the Plaintiff here argues that by determining not

to exercise its option to convert its Series A Notes into YRC stock, Solus "sold" the stock and

should be subject to Section 16(b) liability. In fact, the Blocker Provision constituted Solus'

---

[4]  This holding was expressly reaffirmed by the Second Circuit in 2014 in *Roth v.
Goldman Sachs Grp., Inc.*, another Section 16(b) case brought by Plaintiff and his counsel. The
Second Circuit recognized that *Magma Power* held that "*an option holder's* decision not to
exercise an option to buy stock does not constitute a transaction by the option holder for the
purposes of the statute." 740 F.3d 865, 872 (2d Cir. 2014) (emphasis added). However, for
reasons explained therein, "the expiration of a call option within six months of its writing
[should] be deemed a 'purchase' *by the option writer* to be matched against the 'sale' deemed to
occur when that option was written." 740 F.3d at 872 (emphasis added). In this case, Solus
acted as an option holder and the holding of *Goldman Sachs* is inapplicable.

*Goldman Sachs* also held that even for option writers, liability for the expiration of
options should be limited to cases where the expiration of an option "is matched against its own
writing." *Id.* at 872-73 ("Matching writings with expirations of different options does not clearly
advance the purposes of the statute. Options written at different times are less likely to give rise
to speculative abuse, and matching the expiration of an option only to its own writing recognizes
the more evident danger."). Here, Plaintiff attempts to match the purchase of Series A and Series
B Notes on December 12 and 13 with the expiration of certain of those options (through the
waiver of the Series A Notes' convertibility) on December 23, 2013. To the extent that Plaintiff
attempts to match an option "not against its own writing," the attempt is improper.

irrevocable agreement not to "exercise[] its option" to own YRC stock.  Plaintiff has not, and

cannot, explain how Solus could have "sold" stock it did never owned.  Plaintiff attempts to hold

Solus liable for a "failure to purchase," which does not constitute a sale under clear Second

Circuit precedent.

## CONCLUSION

The Blocker Provision incorporated in Solus' Stock Purchase Agreement was effective as

of December 23, 2013, and reduced Solus' beneficial ownership of YRC equity securities to

below ten percent of securities outstanding.  Plaintiff does not allege that Solus executed a "sale

of securities" before that date, while Solus was "a shareholder who owns more than ten percent

of any one class of the issuer's securities."  *See Gwozdzinsky*, 156 F.3d at 308.  As such, Solus

cannot be liable under Section 16(b).  In addition, the execution of the Blocker Provision is not a

sale under Section 16(b).  As such, Plaintiff's Complaint fails to state a claim for which relief

can be granted and should be dismissed with prejudice.

Dated: April 24, 2015

                                        */s/ Corey Worcester*_____
                                        Corey Worcester
                                        Renita Sharma
                                        QUINN EMANUEL URQUHART &
                                        SULLIVAN, LLP
                                        51 Madison Avenue, 22nd Floor
                                        New York, New York 10010
                                        Tel.: (212) 849-7000
                                        Fax.: (212) 849-7100
                                        coreyworcester@quinnemanuel.com
                                        renitasharma@quinnemanuel.com

                                        *Attorneys for Defendants Solus Alternative
                                        Asset Management LP, Solus GP LLC, Solus
                                        Opportunities Fund 1 LP, Solus
                                        Opportunities Fund 2 LP, Sola Ltd, Solus
                                        Core Opportunities Master Fund Ltd, Ultra
                                        Master Ltd and Christopher Pucillo*

## <u>CERTIFICATE OF SERVICE</u>

I certify that, on April 24, 2015, I caused a true and correct copy of the foregoing to be filed on the Court's CM/ECF system, which will cause a notice of electronic filing to be sent to the following counsel of record for Plaintiff Andrew E. Roth:

> Glenn F. Ostrager
> Ostrager, Chong, Flaherty & Broitman, P.C.
> 570 Lexington Avenue
> 17th Floor
> New York, NY 10022
> (212) 681-0600
> (212) 681-0300 (fax)
> gostrager@ocfblaw.com
>
> Paul D. Wexler
> Kornstein Veisz Wexler & Pollard, LLP
> 757 Third Avenue
> NY, NY 10017
> 212-418-8600
> 212-826-3640 (fax)
> PaulWexler@kvwmail.com

Dated: April 24, 2015

> _/s/ Corey Worcester_____
> Corey Worcester