USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 8/20/15

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
                              :
ANDREW E. ROTH, *derivatively on*
*behalf of* YRC WORLDWIDE INC.,    :
                                                     14cv9571
         Plaintiff,                :

          -against-               :          MEMORANDUM & ORDER

SOLUS ALTERNATIVE ASSET         :
MANAGEMENT LP, *et al.*,
                                          :
         Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

WILLIAM H. PAULEY III, District Judge:

        Andrew E. Roth brings this shareholder derivative action on behalf of YRC Worldwide Inc. ("YRC") against Solus Alternative Asset Management LP, Solus GP LLC, Sola Ltd., Solus Opportunities Fund 1 LP, Solus Opportunities Fund 2 LP, Solus Core Opportunities Master Fund Ltd., Ultra Master Ltd., and Christopher Pucillo (collectively, "Solus"[1]), seeking disgorgement of short-swing profits pursuant to Section 16 of the Securities Exchange Act. Solus, joined by YRC, moves to dismiss the Amended Complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). For the reasons that follow, Solus' motion is denied.

## BACKGROUND

        Section 16(b) of the Securities Exchange Act of 1934 imposes strict liability on insiders of a company whose purchases and sales of securities result in "short-swing profits." See 15 U.S.C. § 78p(b). Short-swing profits are those received from the purchase and sale (or

---

[1] The Amended Complaint alleges that the named Defendants—including various Solus entities and Christopher Pucillo—collectively constitute a "group" for purposes of determining beneficial ownership. (Am. Compl. ¶ 17.) Solus does not challenge that characterization. For simplicity's sake, this motion will refer to the group collectively as "Solus."

vice versa) of a company's stock within a six-month period by persons deemed to be insiders. Insiders include directors, officers, and "beneficial owners" of more than 10% of a company's registered securities. See § 78p(a)(1) and (b). In the Amended Complaint, Roth alleges Solus made matchable, statutorily defined "purchases" and "sales" of YRC stock while it was a beneficial owner of more than 10% of YRC. Roth seeks disgorgement of the resulting short-swing profits.

A. Factual Allegations

The following facts are gleaned from the Amended Complaint and assumed to be true for this motion. While a beneficial owner of more than 10% of YRC's common stock, Solus purchased an aggregate of $15,100,000 principal amount of YRC's Series A Convertible Senior Secured Notes ("Series A Notes") on December 12, 2013, and an aggregate of $2,414,361 principal amount of YRC's Series B Convertible Senior Secured Notes ("Series B Notes") on December 13, 2013. (Am. Compl. ¶ 19.) According to their terms, the Series A and Series B Notes were convertible to 444,040 and 150,805 shares of YRC common stock, respectively. (Am. Compl. ¶ 20.) Under Securities and Exchange Commission ("SEC") rules, Solus was considered to "beneficially own" those shares of common stock.

On December 23, 2013, YRC entered into Stock Purchase Agreements and Exchange Agreements with investors, including Solus, as part of the company's financial restructuring. (Am. Compl. ¶¶ 21 & 22 n.1.) These agreements provided that if certain conditions precedent were met,[2] Solus would purchase shares of YRC common stock, sell its

---

[2] The conditions included (i) satisfaction of the conditions to the effectiveness of the extension of the YRC's collective bargaining agreement with the International Brotherhood of Teamsters, (ii) the amendment and restatement of the YRC's pension fund debt, and (iii) the closing of the issuance of Common Stock and preferred stock with proceeds of not less than $250 million and the exchange or conversion of at least $45 million principal amount of Series B Notes. (Am. Compl. ¶ 22 n.1.) If these conditions were not met before the closing date, investors had the right to terminate the Stock Purchase Agreement. (Stock Purchase Agmt. § 7.) The Stock Purchase Agreement closed on January 31, 2014. (Am. Compl. ¶ 23.)

2

Series A Notes to YRC in exchange for cash, and exchange its Series B Notes for shares of YRC common stock. (Am. Compl. ¶ 22 & n.1.) In January 2014, YRC disclosed that it had entered into a series of confidentiality agreements relating to its financial restructuring, discussed its capital structure with investors, and provided them with confidential information regarding YRC as part of its December 2013 restructuring. (Am. Compl. ¶ 30.)

Under Solus' Stock Purchase Agreement, Solus agreed not to convert its Series A Notes into shares of common stock and agreed not to otherwise sell or transfer its Series A Notes (the "Blocker Provision"). (Am. Compl. ¶ 21.) The Blocker Provision (except its prohibition of sales, assignments, or transfers) purported to survive any termination of the Stock Purchase Agreement. And it purported to be irrevocable and effective upon execution of the Agreement. (Am. Compl. ¶ 21 (citing Stock Purchase Agreement, Ex. 5, Solus' December 23, 2013 Amendment No. 3 to the Schedule 13D [hereinafter "Stock Purchase Agmt."]).) Specifically, it provided:

> (l) Repurchase of Series A Notes; Conversion Limitation. Subject to receipt of the Financing Facilities Consents, the Company shall repurchase from each Buyer or any of its controlled Affiliates and each Buyer or any of its controlled Affiliates shall sell to the Company immediately following the Closing on the Closing Date all of the Series A Notes as listed on Annex III and any additional Series A Notes acquired by the Buyer or any of its controlled Affiliates after the date of this Agreement and prior to the close of business on the business day immediately preceding the Closing Date at a cash purchase price equal to 100% of the aggregate principal amount of such Series A Notes plus all accrued and unpaid interest thereof up to, but not including, the dates such Series A Notes are repurchased.
>
> Buyer irrevocably agrees not to convert, and shall not permit any of its controlled Affiliates to convert, any of the Series A Notes as listed on Annex III hereto into shares of Common Stock in accordance with Section 10.01 of the indenture governing the Series A Notes and shall not otherwise sell, assign or otherwise transfer any of its Series A Notes. This Section 4(l) shall survive termination of this Agreement except that the immediately preceding sentence shall not survive any such termination in respect of sales, assignments and transfers to any person that is not an

>Affiliate of such Buyer or fund or account managed or advised by such Buyer or an Affiliate of such Buyer.

(Stock Purchase Agmt. § 4(*l*).) By holding convertible notes, Solus was deemed the beneficial owner of the underlying YRC stock which Solus had the right to acquire. And when Solus purported to give up its right to convert its Series A Notes in the Blocker Provision, it sought to divest itself of ownership of the underlying YRC stock. Roth alleges that the Blocker Provision failed to achieve its goal, and that Solus remained a 10% beneficial owner of YRC.

In January 2014, Solus engaged in several transactions that Roth alleges would trigger Section 16(b) liability if Solus were still a 10% owner of YRC. Specifically, Solus sold a total of 121,608 shares of YRC common stock; sold $29,589,922 aggregate principal amount of YRC's Series A Notes; and exchanged $12,819,310 aggregate principal amount of YRC's Series B Notes. (Am. Compl. ¶ 34.) Roth alleges the Blocker Provision is an improper attempt to divest ownership in YRC and exploit material nonpublic information while garnering unlawful short-swing profits through its various purchases and sales in December 2013 and January 2014. (Am. Compl. ¶¶ 27-29.)

In October 2014, Roth made a demand on YRC to commence this lawsuit. YRC declined Roth's request. Roth filed this action in December 2014, seeking disgorgement of alleged short-swing profits.

B. <u>Roth's Legal Theories</u>

The Amended Complaint asserts two different theories, which it characterizes as separate "claims" for violations of Section 16(b)—one that assumes the Blocker Provision is valid, and another that assumes it is not.

The first "claim" assumes the Blocker Provision is effective at reducing Solus' beneficial ownership to below the 10% threshold—a premise Solus urges this Court to adopt. Under that theory, Roth alleges that Solus is liable because the Blocker Provision itself

4

constitutes a "sale"—i.e., a reduction in Solus' call equivalent position—that can be matched against an earlier purchase. Solus moves to dismiss on the basis that the Blocker Provision's reduction of beneficial ownership does not constitute a "sale" for purposes of Section 16(b), but rather amounts to the closing of a long derivative security position which is exempt under the statute. However, this exemption only applies if no "value" was received for the closing, a point which the parties dispute.

Roth's second "claim" assumes the Blocker Provision is not effective at reducing Solus' beneficial ownership of YRC because it is illusory or a sham in violation of Section 13d-3(b)'s catchall evasion provision. According to Roth, Solus therefore continued to be deemed a holder of more than 10% of YRC's stock even after the Blocker Provision was executed. Under that theory, Roth alleges a different set of matchable transactions exist for which disgorgement is required. Solus disputes only the premise of this claim, namely that the Blocker Provision was ineffective. Solus does not appear to dispute the existence of subsequent transactions constituting matchable purchases and sales.

Although framed as separate claims, Roth's two legal theories are mutually exclusive, turning as they do on the effectiveness or ineffectiveness of the Blocker Provision. "[W]hen a claimant presents a number of legal theories, but will be permitted to recover only on one of them," there exists only a single claim for relief. Wright, Miller & Kane, 10 Fed. Prac. & Proc. Civ. § 2657 (3d ed. 1998); see also Acumen Re Mgmt. Corp. v. Gen. Sec. Nat. Ins. Co., 769 F.3d 135, 143 (2d Cir. 2014) (holding plaintiff's five theories of breach of contract represent a single claim for purposes of Rule 54(b) where resolution of each "ultimately bear[s] on the question of whether [Defendants'] calculations [of commissions] were correct"). Accordingly, for purposes of this motion, this Court evaluates whether Roth states a claim for relief under Section 16(b) on any single theory.

## DISCUSSION

I.  Legal Standard

   A. Motion to Dismiss

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). To determine plausibility, courts follow a "two-pronged approach." Iqbal, 556 U.S. at 679. "First, although 'a court must accept as true all of the allegations contained in a complaint,' that 'tenet' 'is inapplicable to legal conclusions,' and '[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.'" Harris v. Mills, 572 F.3d 66, 72 (2d Cir. 2009) (alteration in original) (quoting Iqbal, 556 U.S. at 678). Second, a court determines "whether the 'well-pleaded factual allegations,' assumed to be true, 'plausibly give rise to an entitlement to relief.'" Hayden v. Paterson, 594 F.3d 150, 161 (2d Cir. 2010) (quoting Iqbal, 556 U.S. at 679).

A claim must be dismissed, where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." Twombly, 550 U.S. at 558. But "a ruling on a motion for dismissal pursuant to Rule 12(b)(6) is not an occasion for the court to make findings of fact." Roth v. Jennings, 489 F.3d 499, 509 (2d Cir. 2007) (vacating and remanding in part where district court improperly accepted as true defendants' disclaimers of their Section 16(b) "group" status which involved factual issues). At this stage, the Court does not "assay the weight of the evidence which might be offered in support" of the claim. Lopez v. Jet Blue Airways, 662 F.3d 593, 596 (2d Cir. 2011). "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." Twombly, 550 U.S. at 563.

B. Section 16(b)

"Section 16(b) of the Exchange Act requires statutory insiders—those with a beneficial ownership interest of more than 10% in an equity security—to disgorge all profits realized from any purchase and sale (or sale and purchase) of the same security made within a six month period." Analytical Surveys, Inc. v. Tonga Partners, L.P., 684 F.3d 36, 43 (2d Cir. 2012), as amended (July 13, 2012). Disgorgement for these so-called "short-swing profits" only applies when one is a statutory insider at both the time of the purchase and sale in question. 15 U.S.C. § 78p(b); Roth v. Goldman Sachs Grp., Inc., 740 F.3d 865, 875 (2d Cir. 2014). Section 16(b) seeks to prevent "the unfair use of information which may have been obtained" by insiders of a company. Goldman Sachs, 740 F.3d at 869. As such, it "'[i]mposes a form of strict liability' and requires insiders to disgorge . . . 'short-swing' profits 'even if they did not trade on inside information or intend to profit on the basis of such information.'" Goldman Sachs, 740 F.3d at 867 (citations omitted). It "operates mechanically, and makes no moral distinctions, penalizing technical violators of pure heart, and bypassing corrupt insiders who skirt the letter of the prohibition." Magma Power Co. v. Dow Chemical Co., 136 F.3d 316, 320-21 (2d Cir. 1998).

A plaintiff must ultimately prove there was (1) a purchase and (2) a sale of securities (3) by a statutory insider (4) within a six-month period. Goldman Sachs, 740 F.3d at 869 (citing Gwozdzinsky v. Zell/Chilmark Fund, L.P., 156 F.3d 305, 308 (2d Cir. 1998)). This is often no simple task: each element presents its own confounding thicket of novelties. In 1991, the SEC adopted comprehensive amendments to its rules to clarify Section 16(b)'s application to derivative securities.[3] See SEC Release No. 34-28869, 56 Fed. Reg. 7242, 7242-43 (Feb. 8, 1991); see also Donoghue v. Centillium Commc'ns, Inc., No. 05cv4082 (WHP), 2006 WL

---

[3] The SEC rules define "derivative securities" to include "any option, warrant, convertible security, stock appreciation right, or similar right with an exercise or conversion privilege at a price related to an equity security or similar securities with a value derived from the value of an equity security . . . ." 17 C.F.R. § 240.16a-1(c).

7

775122, at *3 (S.D.N.Y. Mar. 28, 2006). But "the growing complexities of financial transactions have generated numerous issues of statutory interpretation that admit of no clear resolution." Goldman Sachs, 740 F.3d at 869. As Judge Winter lamented: "Although Section 16(b) is long in the tooth—older even than the author of this opinion—and the subject of countless judicial interpretations, it seems to be an ever-growing fount of close questions as to its meaning." Goldman Sachs, 740 F.3d at 867.

## II. Beneficial Ownership

A statutory insider includes directors, officers, and "[e]very person who is directly or indirectly the beneficial owner of more than 10 percent of any class of any equity security" of the issuer. 15 U.S.C. § 78p(a). Section 16 adopts the definition of "beneficial owner" found in Section 13(d) of the Exchange Act and the rules promulgated thereunder solely for purpose of determining who is a "beneficial owner" of more than ten percent of the issuer.[4] See Rule 16a-1(a)(1), 17 C.F.R. 240.16a-1(a)(1). Accordingly, SEC Rule 13d–3 defines a "beneficial owner" as follows:

> (a) . . . a beneficial owner of a security includes any person who, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise has or shares:
>
>   i. Voting power which includes the power to vote, or to direct the voting of, such security; and/or,
>
>   ii. Investment power which includes the power to dispose, or direct the disposition of, such security. . . .

17 C.F.R. 240 § 13d–3(a). Under this definition, Solus is a "beneficial owner" of any shares of YRC common stock it owns outright. Importantly, beneficial ownership also attaches to the

---

[4] For all other Section 16 purposes, the Commission adopted a definition of "beneficial owner" based on a person's direct or indirect pecuniary interest in the subject securities. See Rule 16a-1(a)(2), 17 C.F.R. 240.16a-1(a)(2). Thus, even if a person is deemed a beneficial owner of more than 10% of common stock, he is only responsible for disgorgement of short-swing profits on those shares in which he has a pecuniary interest. Huppe v. WPCS Int'l Inc., 670 F.3d 214, 220 & n.5 (2d Cir. 2012).

8

right to acquire securities, deeming owners of such a right as owners of the underlying stock itself. This reflects the SEC's view that "holding derivative securities is functionally equivalent to holding the underlying equity securities for purposes of Section 16." <u>Ownership Reports and Trading by Officers, Directors and Principal Stockholders</u>, Exchange Act Release No. 34–28869, 56 Fed. Reg. 7242, 7248 (Feb. 21, 1991). Rule 13d–3 defines how one is "deemed" to be the beneficial owner of a security:

> (d) Notwithstanding the provisions of paragraphs (a) and (c) of this rule:
>
> > (1)(i) A person shall be deemed to be the beneficial owner of a security, ... if that person has the <u>right to acquire</u> beneficial ownership of such security, as defined in Rule 13d–3(a) (§ 240.13d–3(a)) within sixty days, including but not limited to any right to acquire: (A) through the exercise of any option, warrant or right; (B) through the conversion of a security; (C) pursuant to the power to revoke a trust, discretionary account, or similar arrangement; or (D) pursuant to the automatic termination of a trust, discretionary account or similar arrangement . . . .

17 C.F.R. 240 § 13d–3(d)(1)(i) (emphasis added). Holders of freely convertible notes are generally deemed to be beneficial owners of the underlying common stock because they have the right to acquire those shares. <u>See</u> <u>Greenberg v. Hudson Bay Master Fund Ltd.</u>, No. 14cv5226 DLC, 2015 WL 2212215, at *7 (S.D.N.Y. May 12, 2015).

Here, Solus was deemed the beneficial owner of the underlying securities into which the Series A and B Notes could be converted. Thus, Solus was a 10% owner of YRC by virtue of its collective ownership of common stock and convertible notes. Having attained its insider status, Solus was vulnerable to Section 16's "crude rule of thumb,"[5] and would face disgorgement of any profits received from purchases and sales made within a six-month period as long as Solus remained an insider. The Blocker Provision was a workaround that purported to

---

[5] <u>Kern Cnty. Land Co. v. Occidental Petroleum Corp.</u>, 411 U.S. 582, 609 (1973) (quoting Hearings on Stock Exchange Practices before the Senate Committee on Banking and Currency, 73d Cong., 2d Sess., pt. 15, p. 6557 (1934)).

9

divest Solus of its beneficial ownership of enough securities to take Solus below the 10% threshold without triggering Section 16 liability.[6]

### III. Blocker Provision

It is axiomatic that "[l]iability cannot be imposed simply because the investor structured his transaction with the intent of avoiding liability under § 16(b)." Reliance Elec. Co. v. Emerson Elec. Co., 404 U.S. 418, 422 (1972). "The question is, rather, whether the method used to 'avoid' liability is one permitted by the statute." Reliance Elec., 404 U.S. at 422. Here, as Solus' counsel acknowledged at oral argument, it is "no secret" that the Blocker Provision was executed as an attempt to avoid Section 16(b) liability. (See Oral Arg. Tr. 12:20-25.) And Solus makes two principle arguments as to why it succeeded.

#### A. Conversion Cap

A conversion cap, or "blocker," is one permissible way of avoiding section 16(b) liability. As explained above, the definition of beneficial ownership extends to convertible securities insofar as the holder retains the right to acquire the underlying security within 60 days. The SEC has explained the rationale behind this policy as follows:

> The near-term right to acquire voting or investment power over a security [is] the equivalent of having current voting or investment power over the security. The near-term right to acquire power may be just as influential, in terms of affecting control of a corporation, as the present possession of those powers. And since Section 13(d) is intended to provide early warnings to investors of potential changes in control, it makes sense to advise investors of the incipient acquisition of these powers.

---

[6] While this Court need not reach the question of whether the Blocker Provision itself might constitute a "sale," it is worth noting that the SEC's decision to use Section 13(d) standards to calculate beneficial ownership made it possible to cross the 10% percent threshold in either direction without effectuating a purchase or sale. See Peter J. Romeo & Alan L. Dye, Section 16 Treatise and Reporting Guide 1026 [§ 10.02[2][b]] (4th ed. 2012). One widely cited treatise suggests this result might be accomplished where one "places in an irrevocable trust over which the person has no voting or investment control the number of securities needed to drop under the [10%] threshold." Romeo & Dye, 1026 n.59 [§ 10.02[2][b]]. This theory appears to be untested in the courts.

10

Brief of the SEC as Amicus Curiae Supporting Appellees, Levy v. Southbrook Int'l Investments, 263 F.3d 10 (2d Cir. 2001) (No. 00-7630), 2001 WL 34120374, at *18-19 [hereinafter "SEC's Amicus Brief"] (citing Filing and Disclosure Requirements Relating to Beneficial Ownership, Exchange Act Release No. 14692, 14 SEC Docket 862, 1978 WL 14827, at *15 (April 21, 1978)); see also Levy, 263 F.3d at 15-16 (discussing same policy).

        To avoid the consequences of crossing certain ownership thresholds, holders of convertible securities can limit conversion rights by way of conversion caps, also known as blocker provisions. Specifically, these limit the right of the holder to convert securities above an agreed upon amount or percentage. As long as such a cap is binding, the defendant cannot be the beneficial owner of more than the amount of stock specified in the conversion cap. Compare Levy v. Southbrook Int'l. Investments, Ltd., 263 F.3d 10, 17 (2d Cir. 2001) (affirming dismissal where conversion cap was valid and binding on its face), with Greenberg v. Hudson Bay Master Fund Ltd., No. 14cv5226 (DLC), 2015 WL 2212215, at *7 (S.D.N.Y. May 12, 2015) (denying motion to dismiss where conversion cap lacked clear enforcement mechanism as to collective ownership by alleged "group" members).

        Solus argues that its Blocker Provision amounts to a routine conversion cap similar to ones which courts have upheld.[7] But the Blocker Provision here is not really a "blocker" (or "cap") at all. It is a one-time divestment mechanism: its sole purpose is to divest Solus of beneficial ownership of a block of securities—the stock into which Solus' Series A Notes were convertible—without regard to whether Solus might attain greater than 10% ownership by subsequent purchases. As such, rather than preventing Solus from attaining insider status (i.e., greater than 10% beneficial ownership), the Blocker Provision purports to eliminate

---

[7] See, e.g., Levy, 263 F.3d at 16-18; Levner v. Prince Alwaleed, 61 F.3d 8, 9 & n.1 (2d Cir. 1995); Log On Am., Inc. v. Promethean Asset Mgmt. L.L.C., 223 F. Supp. 2d 435, 448 (S.D.N.Y. 2001).

11

it. Counsel for Solus acknowledged at oral argument that the parties could not identify any cases where a conversion cap or blocker was executed <u>after</u> a shareholder became a greater than 10% owner of the issuer. (June 26, 2015 Oral Arg. Tr. 4-5.) This is not a trivial distinction under Section 16(b) which is inherently wary of insiders, and presumes that they have unique access to inside information and could abuse it. See <u>Foremost-McKesson, Inc. v. Provident Securities Co.</u>, 423 U.S. 232, 242 (1976); see also <u>Analytical Surveys, Inc. v. Tonga Partners, L.P.</u>, 684 F.3d 36, 47-48 (2d Cir. 2012) (decision to eliminate Note's mandatory conversion provision gave insider noteholder "latitude to use inside information to determine whether it could realize a greater return from taking the principal balance in cash or from converting that principal into shares for later sale"), <u>as amended</u> (July 13, 2012). And the law makes no exception for those "deemed" insiders by virtue of their right to acquire stock, even if they never exercise that right, because they are similarly presumed to have the potential to influence or control the issuer. See SEC's Amicus Brief, <u>supra</u>, at *18-19; <u>Ownership Reports & Trading by Officers, Directors & Principal Sec. Holders</u>, Release No. 17991 (Feb. 8, 1991). Solus' status as an insider at the time it executed the Blocker Provision is not dispositive, but it certainly distinguishes this case from ordinary conversion cap precedent.

    B.  <u>Waiver</u>

Solus contends that the Blocker Provision constitutes a valid waiver of its conversion rights. The voluntary relinquishment of a contractual right "is essentially a matter of intent which must be proved." <u>Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of New Jersey, Inc.</u>, 448 F.3d 573, 585 (2d Cir. 2006) (citations omitted). Such intent is a question of fact. <u>Beth Israel Med. Ctr.</u>, 448 F.3d at 585. Solus asserts that because Roth does not question its intent, the waiver is effective. (Solus Reply 5 n.1.) But Roth asserts a number of alternative arguments, one of which is that Solus retained the benefits of its contractual right to

12

convert by retaining the ability to transfer the notes to third parties who could convert them to YRC stock. In sum, while Roth acknowledges that Solus never converted the Series A Notes, he does not appear to concede that Solus voluntarily relinquished its right to convert them.

Even if Solus intended to waive its conversion rights, the Blocker Provision was not necessarily effective in divesting Solus of beneficial ownership. "When the limitations provided by conversion caps are discovered to be illusory[8] or a sham,[9] they should be disregarded and the courts should analyze the case as though no such limitations existed." Levy, 263 F.3d at 17 n.4 (citing SEC's Amicus Brief, supra, at *25–26). The same is true where an investor uses a contract or other arrangement to divest himself of beneficial ownership as part of a plan or scheme to evade beneficial ownership reporting requirements—the investor is deemed to own the securities he seeks to divest. 17 C.F.R. § 240.13d–3(b); see generally CSX Corp. v. Children's Inv. Fund Mgmt. (UK) LLP, 654 F.3d 276, 302-07 (2d Cir. 2011) (Winter, J., concurring) (discussing contours of SEC Rule 13d-3(b)'s catchall evasion provision). An informal understanding is sufficient to trigger this rule, so long as the transaction includes a "component that provides a substantial equivalence of the rights of ownership relevant to control, or include[s] steps that stop short of, or conceal, the vesting of ownership, while nevertheless ensuring that such ownership will vest at the signal of the would-be owner." CSX Corp., 654 F.3d at 305.

---

[8] Even though the Blocker Provision is not a "conversion cap," see supra Part III.A, both would be subject to similar limitations to the extent that both involve mechanisms to divest, or prevent the vesting of, beneficial ownership. In its amicus brief in Levy, the SEC advanced several factors for courts to consider in evaluating whether a conversion cap is illusory, including whether the cap is easily waivable by the parties (particularly the holder of the convertible securities); lacks an enforcement mechanism; has not been adhered to in practice; or can be avoided by transferring the securities to an affiliate of the holder. And the SEC suggested that whether a cap is binding might include whether it is provided in the certificate of designation or the issuer's governing instruments; reflects limitations established by another regulatory scheme applicable to the issuer; or is the product of bona fide negotiations between the parties. SEC's Amicus Brief, supra, at *25.

[9] See Bershad v. McDonough, 428 F.2d 693, 697 (7th Cir. 1970), cert. denied, 400 U.S. 992 (1971) ("[t]he commercial substance of the transaction rather than its form, must be considered, and the courts should guard against sham transactions . . ."), cited in Levy, 263 F.3d at 17 n.4.

Here, Solus, as an insider, purported to negotiate its way out of Section 16(b) liability through an agreement with the issuer. Such agreements are inherently suspect. <u>Cf.</u> Peter J. Romeo & Alan L. Dye, <u>Section 16 Treatise and Reporting Guide</u> 981-83 [§ 9.04[3][c]] (4th ed. 2012) (an agreement or understanding with the issuer that would operate as waiver or release of issuer's right to recover short-swing profits is unenforceable). This is especially true where, as here, the agreement was negotiated as part of the rescue of YRC, and its enforcement is largely limited to Solus' own promises.

To be sure, "even if a transaction is found to present the opportunity for speculative abuse, there can be no liability under Section 16(b) unless the statutory requirements are also met." <u>Gwozdzinsky</u>, 156 F.3d at 310 (citation omitted). At this stage, Roth's allegations amount to a plausible claim for relief on the theory that the Blocker Provision was not effective and Solus remained a 10% owner of YRC while executing sales of YRC stock. Whether Roth can prove his claim on a more fully developed record can only be addressed after discovery. Accordingly, Solus' motion to dismiss is denied.

CONCLUSION

For the foregoing reasons, Solus Alternative Asset Management LP, Solus GP LLC, Sola Ltd., Solus Opportunities Fund 1 LP, Solus Opportunities Fund 2 LP, Solus Core Opportunities Master Fund Ltd., Ultra Master Ltd., and Christopher Pucillo's motion to dismiss the Amended Complaint is denied.

The parties are directed to meet and confer and submit a proposed discovery schedule for the court's consideration by September 15, 2015.

The Clerk of the Court is directed to terminate the motion pending at ECF No. 39.

Dated:  August 20, 2015
      New York, New York

SO ORDERED:

_____
WILLIAM H. PAULEY III
U.S.D.J.

*All Counsel of Record.*

15