UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
ANDREW E. ROTH, *derivatively on* :
*behalf of* YRC WORLDWIDE, INC                OPINION & ORDER

    Plaintiff,  :
             14-CV-9571 (WHP)
  -against-    :

             :
SOLUS ALTERNATIVE ASSET,
MANAGEMENT LP, *et al.*
             :
    Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

WILLIAM H. PAULEY III, United States District Judge:

    Andrew Roth brings this shareholder derivative suit on behalf of YRC Worldwide Inc. ("YRC") against Solus Alternative Asset Management LP, Solus GP LLC, Sola Ltd., Solus Opportunities Fund 1 LP, Solus Opportunities Fund 2 LP, Solus Core Opportunities Master Fund Ltd., Ultra Master Ltd. and Christopher Pucillo (collectively, "Solus"). Roth alleges violations of § 16 of the Securities Exchange Act and seeks disgorgement of short-swing profits. Both parties move for summary judgment. For the following reasons, Roth's motion for summary judgment as to liability is denied and Solus's motion for summary judgment dismissing this action is granted.

BACKGROUND

    This action arises from the 2013 restructuring of YRC, a Kansas-based trucking company. (See Parties' Joint Rule 56.1 Statement of Undisputed Facts ("56.1 Stmt.") ¶ 1.) Toward the end of 2013 YRC found itself in a precarious financial position, with more than $1 billion in debt due in February 2014. (56.1 Stmt. ¶¶ 14, 28, 29.) YRC launched a refinancing plan that involved extending its labor agreement with the International Brotherhood of

Teamsters, the labor union to which most YRC employees belonged. (56.1 Stmt. ¶ 12.) In early December, YRC and the union leadership reached an agreement to extend the contract through 2018 provided that, inter alia, (1) the union membership ratified the extension by January 8, 2014 and (2) YRC retired at least 90% of its outstanding Series A and Series B Notes. (56.1 Stmt. ¶ 48.) Both the Series A and Series B Notes were convertible into YRC common stock. As of November 14, 2013, Solus held Series A and Series B Notes representing the equivalent of 5.32% of all outstanding YRC stock. (56.1 Stmt. ¶ 36.)

With the labor-contract extension in place, YRC developed a restructuring plan that involved issuing new shares of common stock, selling those shares in a private placement, and then using the proceeds of the sale to repurchase Series A Notes from the investors who participated in the private placement. (56.1 Stmt. ¶ 49.) The company approached existing noteholders in early December, asked them to sign non-disclosure agreements, and began negotiating the terms of the private placement. (56.1 Stmt. ¶ 46.)

Between December 9 and 13 (but prior to signing the non-disclosure agreement), Solus purchased additional YRC securities, which caused Solus to become a beneficial owner of more than 10% of the outstanding YRC shares. (56.1 Stmt. ¶¶ 50–51.) Thereafter, Solus made two purchases of Series A and Series B Notes with an aggregate principal amount of more than $17.5 million and publicly reported these increases in beneficial ownership pursuant to Schedule 13D and § 16(a). (56.1 Stmt. ¶¶ 52, 56.)

The restructuring plan called for the issuance of a large block of YRC common shares, creating a potential obstacle to the restructuring in the form of the company's share cap— that is, the maximum number of shares of common stock that YRC could issue without holding a shareholder vote. (56.1 Stmt. ¶¶ 62–63.) YRC was obligated to hold enough shares in reserve to

cover conversion requests for all outstanding Series A and Series B Notes. (56.1 Stmt. ¶ 69.) The stock issue required to complete the restructuring, when combined with those reserved shares, would cause YRC to exceed its share cap. With the default date looming, however, YRC did not have time to hold a shareholder vote on the share cap. (56.1 Stmt. ¶¶ 70, 73.) Accordingly, YRC asked all potential investors in the restructuring who held Series A Notes to waive the convertibility feature, thereby freeing up the corresponding reserved shares for issue in the private placement. (56.1 Stmt. ¶ 73.) This conversion waiver was terminable in the event that the restructuring did not close on or before February 13, 2014. (See Declaration of Michael E. Swartz ("Swartz Decl."), Ex. 74 at ¶ 7(a).)

On December 22, YRC set the final purchase price for the private placement and notified the ten investors of their individual share allocations. (56.1 Stmt. ¶ 78.) Solus's allocation was worth $25 million. (56.1 Stmt. ¶ 80.) At the time, Solus was a beneficial owner of 14.56% of YRC's common stock through its holdings of stock and convertible Notes. (56.1 Stmt. ¶ 55.) Thus, Solus was concerned that any profits derived from its participation in the restructuring would be subject to disgorgement as short-swing gains under § 16(b).

On advice of outside counsel, Solus requested that YRC modify the conversion waiver in Solus's Stock Purchase Agreement to make the waiver permanent and irrevocable upon execution, regardless of whether the restructuring closed by February 13. (56.1 Stmt. ¶ 82.) This change would, Solus believed, reduce its beneficial ownership to 8.43% of YRC common stock prior to the stock purchase, thereby eliminating any § 16(b) liability for Solus's participation in the restructuring. (56.1 Stmt. ¶ 82.) To retain "protection" in the event that the restructuring failed to close, however, Solus also requested that the permanent waiver apply only to Solus and its affiliates, and not to any subsequent, unaffiliated purchaser of the Notes. (56.1

3

Stmt. ¶ 88; Swartz Decl. Ex. 53.)  YRC agreed to these proposed changes, the parties executed the revised Stock Purchase Agreement on December 23, and Solus filed an amended Schedule 13D disclosing the full structure of the transaction the following day.  (56.1 Stmt. ¶ 92.)  The restructuring closed on January 31, 2014.  (56.1 Stmt. ¶ 127.)

## LEGAL STANDARD

A. **Summary Judgment**

Summary judgment should be granted if the record shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986).  The burden of demonstrating the absence of any genuine dispute of material fact rests with the moving party.  See Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970).  Once the moving party has made an initial showing that there is no genuine dispute of material fact, the non-moving party cannot rely on the "mere existence of a scintilla of evidence" to defeat summary judgment but must set forth "specific facts showing that there is a genuine issue for trial."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor."  Beyer v. Cty. of Nassau, 524 F.3d 160, 163 (2d Cir. 2008) (quoting Guilbert v. Gardner, 480 F.3d 140, 145 (2d Cir. 2007)).  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  Scott v. Harris, 550 U.S. 372, 380 (2007) (citing Matsushita, 475 U.S. at 586–87).  The Court resolves all factual ambiguities and draws all inferences in favor of the non-moving party.  See Liberty Lobby, 477 U.S. at 255; see also Jeffreys v. City of New York, 426 F.3d 549, 553 (2d Cir. 2005).

4

B. **Section 16(b)**

To establish liability under § 16(b), a plaintiff must show "that there was (1) a purchase and (2) a sale of securities (3) by an officer or director of the issuer or by a shareholder who owns more than 10% of any one class of the issuer's securities (4) within a six month period." Gwozdzinsky v. Zell/Chilmark Fund, L.P., 156 F.3d 305, 308 (2d Cir. 1998). "Section 16(b) thus compels statutory insiders to disgorge profits earned on any purchase and sale (or sale and purchase) made within six months of each other." Magma Power Co. v. Dow Chem. Co., 136 F.3d 316, 320 (2d Cir. 1998).

For the purpose of determining statutory-insider status, § 16(b) borrows the definition of "10% beneficial owner" from § 13(d) of the Exchange Act. See 17 C.F.R. 240.16a-1(a)(1). Rule 13d-3 defines "10% beneficial owner" as "any person who, directly or indirectly . . . has or shares . . . the power to vote, or to direct the voting of, such security; and/or . . . the power to dispose, or direct the disposition of, such security." 17 C.F.R. 240 § 13d-3(a). In 1991, the SEC amended Rule 13d-3 to capture holders of derivative and convertible securities. Under Rule 13d-3(d)(1), a person is a "beneficial owner of a security . . . if that person has the right to acquire beneficial ownership of such security . . . within sixty days." 17 C.F.R. 240 § 13d-3(d)(1)(i).

The Supreme Court has held that courts should interpret § 16(b) strictly so as to "preserve[] its mechanical quality," calling the statute "a relatively arbitrary rule capable of easy administration." Reliance Elec. Co. v. Emerson Elec. Co., 404 U.S. 418, 422–25 (1972). Accordingly, § 16(b) requires disgorgement only where the defendant was a statutory insider

within the meaning of the rule "both at the time of the purchase and sale, or the sale and purchase, of the security involved." Foremost-McKesson, Inc. v. Provident Secs. Co., 423 U.S. 232, 235 (1976).

## DISCUSSION

It is undisputed that Solus held more than 14% of YRC common stock, by virtue of its ownership of stock and convertible notes, prior to execution of the Stock Purchase Agreement. The issue is whether the conversion waiver effectively extinguished Solus's "right to acquire" the stock underlying the Series A Notes or, in the alternative, whether that waiver constituted a matchable sale under § 16(b). Roth advances two theories of liability on this point: the "ineffective/sham waiver" theory, and the "matchable sale" theory.

### A. **Ineffective/Sham Waiver Theory**

Roth's primary argument is that the conversion waiver was ineffective to remove Solus's statutory-insider status or, in the alternative, that the waiver was effective but should be disregarded as a "sham" designed to evade § 16(b) liability.

The Supreme Court has endorsed the practice of designing financial transactions specifically to avoid disgorgement under § 16(b). See Reliance, 404 U.S. at 422 ("Liability cannot be imposed simply because the investor structured his transaction with the intent of avoiding liability under § 16(b).") "The question is, rather, whether the method used to 'avoid' liability is one permitted by the statute." Reliance, 404 U.S. at 422. Investors in convertible instruments commonly enter into contractual agreements not to convert past certain benchmarks (5% or 10%) that could trigger liability under SEC rules, and these arrangements have been upheld in the Second Circuit. See Levy v. Southbrook Intern. Inv. Ltd., 263 F.3d 10, 12 (2d Cir. 2001) (no § 16(b) liability where investor waived the ability to acquire more than 4.9% of total

6

outstanding shares through exercise of conversion rights). The Second Circuit has held that, for the purposes of determining whether a defendant is a § 16(b) statutory insider, "where a binding conversion cap denies an investor the right to acquire more than 10% of the underlying equity securities of an issuer, at any one time, the investor is not, by virtue of his or her ownership of convertible securities, the beneficial owner of more than 10% of those equity securities." Levy, 263 F.3d at 12.

Roth argues first that Solus's conversion waiver was ineffective because it was not accomplished via amendment to the Series A Indenture, which would have required the majority vote of Series A noteholders. (See Plaintiff's Opposition and Cross-Motion ("Roth Opp."), ECF No. 96 at 10.) Because Solus merely agreed in an extraneous contract (the Stock Purchase Agreement) not to convert its Notes, Roth claims, the conversion feature of the Indenture remained intact and Solus never relinquished its right to acquire the underlying YRC common stock. This argument is not persuasive. First, as Solus points out, binding contractual agreements between issuers and noteholders (like the Stock Purchase Agreement) are quite common and far more efficient than a wholesale amendment of the Indenture. Second, this analysis simply leads back to the dispositive question: was the conversion waiver in the Stock Purchase Agreement binding and enforceable? If it was, then the fact that YRC never amended the Indenture is irrelevant because Solus had permanently and irrevocably waived its right to convert the Notes.

In an amicus brief in Levy which this Court finds persuasive, the SEC offered a list of non-exclusive factors indicative of whether a conversion cap is binding. Factors that suggest a conversion cap is illusory include "whether the cap [1] is easily waivable by the parties (particularly the holder of the convertible securities); [2] lacks an enforcement mechanism; [3]

7

has not been adhered to in practice; or [4] can be avoided by transferring the securities to an affiliate of the holder." Brief of the Securities and Exchange Commission, 2001 WL 34120374, at *25 (2d Cir. Mar. 23, 2001). Here, it is undisputed that the Solus conversion waiver was irrevocable, applied to all Solus affiliates, and was adhered to in practice. The parties disagree as to whether an effective enforcement mechanism existed for YRC.

Roth asserts that the conversion waiver was not enforceable by YRC because the Series A Notes were global securities, registered in the name of the Depository Trust Company ("DTC") and held by Solus through a broker. If Solus submitted a conversion request through its broker, Roth claims, YRC would not know who was requesting the conversion and would issue the shares in contravention of the waiver. (See Roth Opp. at 13.) While imaginative, this argument appears to be pure conjecture. Roth cites to nothing in the record nor to any legal authority for the proposition that issuers lack power over the issuance of shares held by the DTC. Further, even if Solus could have accomplished this caper, YRC would have had rescission rights under § 8(m) of the Stock Purchase Agreement, which allows "[a]ny person having any rights under any provision of this Agreement" to sue for specific performance. (See Swartz Decl. Ex. 57, at 33.)

Roth's remaining arguments on the illusory or "sham" nature of the conversion waiver lack merit. There is no evidence to suggest that the negotiations between YRC and Solus—or, rather, between their respective outside attorneys—were not bona fide. Roth's contention that YRC "needed" the restructuring to close, rendering them unable to push back against Solus's demands, ignores the fact that the YRC restructuring was oversubscribed by $100 million. When one of the largest investors demanded too many changes to the Stock Purchase Agreement that delayed the closing, YRC threatened to re-allocate that investor's shares to other

8

participants. (See Supplemental Declaration of Michael E. Swartz, Ex. B.) Taken as a whole, the record suggests that the Stock Purchase Agreement was the product of bona fide negotiations between sophisticated parties through their outside counsel.

Finally, Roth's contention that the conversion waiver is void under § 29(a), which prohibits parties from waiving compliance with the Exchange Act, is misplaced. The § 29(a) cases cited by Roth are plainly distinguishable from the situation at issue here. See, e.g., Volk v. Zlotoff, 285 F. Supp. 650, 658 (S.D.N.Y. 1968) (issuer's attempted "ex post facto" rescission of directors' stock option exercise in violation of § 16(b) was void under § 29(a)). Solus and YRC did precisely what the Supreme Court and the Second Circuit have previously approved—they entered into a binding conversion waiver for the purpose of eliminating Solus's statutory-insider status, thereby precluding § 16(b) liability for Solus in the subsequent restructuring. Accordingly, the conversion waiver was neither ineffective nor a sham. It was an enforceable contractual agreement between Solus and YRC.

B. **Matchable Sale Theory**

Even if the conversion waiver was effective, Roth argues, Solus is still subject to disgorgement under § 16(b) because the waiver constituted a matchable "sale" of the common stock underlying the Series A Notes. Under Rule 16b-6, "[t]he establishment of or increase in a call equivalent position . . . shall be deemed a purchase of the underlying security for purposes of section 16(b) of the Act, and the . . . liquidation of or decrease in a call equivalent shall be deemed a sale of the underlying securities." 17 C.F.R. § 240.16b-6(a). Put more simply, for § 16(b) purposes "the acquisition or disposition of a derivative security with a fixed exercise price is treated just as if the insider had traded the underlying security itself." Magma Power, 136 F.3d at 322.

9

Roth's argument on this point is that Solus's waiver of the conversion feature constituted a decrease in its call equivalent position and was thus a "sale" for § 16(b) purposes. Solus counters that no sale occurred, but in any case that the transaction is covered by the "No Value Exception," which exempts from § 16(b) the "disposition or closing of a long derivative security position, as a result of a cancellation or expiration . . . where no value is received from the cancellation or expiration." 17 C.F.R. § 240.16b-6(d). The parties dispute both whether there was a "cancellation" in this transaction and whether Solus received "value" for the waiver.

     i.     Whether the Waiver Constituted a "Cancellation"

On this issue, Roth reiterates his arguments that there was no true "cancellation" of the convertibility feature because YRC and Solus did not seek an amendment of the Series A Indenture, and because Solus retained the ability to re-sell the Notes with the convertibility feature intact. As discussed above, the first point is unavailing because it borders on the hyper-technical and ignores the fact that Solus (and its affiliates) permanently and irrevocably waived the right to convert the Notes, regardless of what the Indenture might say.

As to Solus's retention of the economic value of the convertibility feature despite the waiver, Roth's argument overlooks the purpose of § 16(b). The short-swing trading rules focus on "beneficial ownership" (i.e. the right to vote and dispose of shares) because of "the power over corporate affairs associated with significant equity ownership," a power which "also implicates access to inside information and the potential for insider trading." Levy, 263 F.3d at 16. However advantageous an economic position Solus might have constructed for itself—Solus could buy into the restructuring if it closed, or sell the Notes at face value (because a third party would not be subject to the conversion waiver) if it did not close—there is no question that the conversion waiver extinguished its right to exchange the Series A Notes for common shares and

vote those shares. Accordingly, there was a complete cancellation of Solus's call equivalent position in the shares underlying the Series A Notes.

    ii.    <u>Whether Solus Received "Value" for the Waiver</u>

Next, Roth argues that Solus received "value" for the conversion waiver in the sense that the waiver was an "integral" part of the agreement that allowed Solus to participate in the YRC restructuring. Participation in the restructuring gave Solus the opportunity to sell its Series A Notes at a substantial profit and purchase YRC common stock at a discount—thus, Roth claims, Solus received significant "value" for waiving its conversion rights. As Roth acknowledges, however, "it was a complete non-issue for YRC to agree to" changing the conversion waiver to make it permanent and irrevocable rather than contingent on closing. (<u>See</u> Plaintiff's Reply Memorandum, ECF No. 102, at 3.) The parties had negotiated all material terms of the Stock Purchase Agreement prior to Solus's request—an amendment that only made the conversion waiver <u>more</u> restrictive for Solus—and YRC gave no consideration whatsoever in exchange for this strengthened conversion waiver. Any value that Solus can be said to have received for waiving its conversion rights was not connected to its agreement to make the waiver irrevocable. Thus, Solus received no value for permanently cancelling its call equivalent position, and the "No Value Exemption" applies to this transaction.

## CONCLUSION

For the reasons stated above, Solus's motion for summary judgment is granted and Roth's motion for summary judgment as to liability is denied. The Clerk of Court is directed to close all pending motions and mark this case as closed.

Dated: June 30, 2017
      New York, New York

SO ORDERED:

WILLIAM H. PAULEY III
U.S.D.J.